**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES COLLINS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 08 C 2153 |
| v. | ) | |
| | ) | Honorable Charles R. Norgle |
| DON HULICK, Warden, | ) | |
| Menard Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the Court is Petitioner James Collins' ("Collins") Petition pursuant to 28

U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. Petitioner

Collins challenges his murder conviction on the grounds that he did not knowingly and

intelligently waive his constitutional rights to counsel and against self-incrimination and

therefore his inculpatory statements to law enforcement personnel should have been

suppressed at trial. For the following reasons, the Petition is denied.

**I. BACKGROUND[1]**

**A. FACTS[2]**

*1. The Interrogation of Collins*

---

[1]    Because Collins' Petition is focused exclusively on issues related to his waiver of his rights to counsel and against self-incrimination, this Opinion will also focus primarily on facts relevant to that waiver. For a detailed recitation of the facts regarding the crime at issue, see People v. Collins, No. 01 CR 13513 (Ill. App. Ct. June 19, 2006).

[2]    Unless otherwise attributed, the following facts are taken from the transcripts of the hearings held by the Circuit Court of Cook County on Collins' motion to suppress his inculpatory statements and his motion to quash his arrest.

On May 1, 2001 at 6:50 a.m., Chicago police officer Jeffrey Felton ("Felton") and his partner Andrew Cuomo ("Cuomo") went to 2910 West Harrison in response to a 911 call concerning Flora Lanier ("Lanier"). Upon reaching the location, Felton saw Lanier, who died shortly thereafter, lying in a hallway with substantial lacerations on her arms. Felton was then directed by Sergeant Salitsky to speak with Collins because Salitsky thought Collins possessed knowledge regarding Lanier's injuries. Felton and Cuomo asked Collins if he would come to the police station at Harrison and Kedzie as a witness and Collins agreed. The two drove Collins two-and-a-half blocks to the station in the back seat of their car, but Felton denies Collins' claim that he placed handcuffs on Collins. After arriving at the station at approximately 8:00 a.m., the officers took Collins upstairs to Area Four headquarters and turned him over to a plainclothes detective.

At 10:30 a.m. that same morning, Detective John O'Shea ("O'Shea") interviewed Collins as part of his assignment to investigate an "attempt[ed] suicide" at 2910 West Harrison. Hr'g Tr., June 20, 2002 at F-29. Prior to O'Shea's initial interview of Collins, O'Shea introduced himself and advised Collins of his rights under Miranda v. Ariz., 384 U.S. 436 (1966). During the interview, which lasted five or ten minutes, Collins denied harming Lanier. O'Shea asked Collins to take a polygraph test and Collins agreed. O'Shea scheduled an appointment for a polygraph examination at 8:00 p.m. that evening. In the meantime, Collins was placed in a locked interview room, where he was given food and allowed to use the bathroom. According to Collins, he asked the police to release him, but they denied his request.

At approximately 8:00 p.m., O'Shea took Collins to the polygraph laboratory at 1011 South Homan Avenue for his examination. At the polygraph laboratory, Chicago

2

police officer Robert Bartik ("Bartik") introduced himself to Collins and presented Collins with a polygraph subject consent form. Bartik testified that he reviewed the form with Collins. The consent form contained the Miranda warnings and, when asked by Bartik, Collins stated that he understood the warnings. Collins signed the consent form and Bartik proceeded with the examination. At the conclusion of the examination, Bartik told Collins "that the examination clearly showed that he was not telling the truth" regarding his involvement with Lanier's death. Hr'g Tr., Aug. 4, 2003 at F-46-47.

At approximately 10:00 p.m., O'Shea picked up Collins from the polygraph laboratory and brought him back to the Area Four interview room. At 11:59 p.m. on May 1, O'Shea and his partner officer Joseph Lascaro ("Lascaro") conducted a second interview with Collins. O'Shea again advised Collins of his Miranda rights and then told him that the results of his polygraph examination indicated Collins was lying. Collins proceeded to make what O'Shea characterized as an inculpatory statement. As a result, O'Shea placed Collins under arrest and contacted Cook County Assistant State's Attorney Art Heil ("Heil"). Heil arrived at area four shortly after 2:00 a.m. on May 2, 2001.

Upon Heil's arrival, he reviewed Detectives O'Shea and Lascaro's reports on the case and discussed the matter with the detectives. Heil, O'Shea and Lascaro then went to 2910 West Harrison to interview a witness. The three arrived back at Area Four at approximately 6:00 a.m., whereupon Heil met with Collins. Heil introduced himself to Collins as a lawyer and prosecutor and not Collins' lawyer and advised Collins of his Miranda rights. During Heil's initial conversation with Collins, Collins made an inculpatory statement to Heil, but Heil did not take notes during the conversation.

3

According to Heil, Collins agreed to have Heil memorialize his inculpatory statement in writing in Collins' presence. Prior to the taking of Collins' statement, Collins indicated to Heil that he had been treated well by the police and by Heil.

Heil began memorializing Collins' statement on pre-printed forms at 7:00 a.m. on May 2, 2001. The pre-printed forms contained a written version of the Miranda rights which Heil testified he had Collins read out loud prior to the taking of his statement. According to Heil, "[Collins] said he was giving [his] statement freely and voluntarily and that no threats or promises were made to him to make that statement." Id. at F-19. After Collins gave his statement, Heil had Collins read the first paragraph of the written statement out loud to him. Heil then read Collins the remainder of the statement while Collins read along. Heil testified that "[a]t the conclusion of each page that we read, [Collins] would sign the bottom and I would sign the bottom and the other detective would sign the bottom if that was the way he wanted." Id. at F-20.

Collins' statement provides in pertinent portion that:

[O]n the early morning of May 1, 2001, he and Flora had been up all night partying together. James states that they both smoked some crack cocaine. James states that at around six o'clock a.m., he and Flora got into an argument. James states that the argument began over Flora not wanting to go to bed. James states that both he and Flora were yelling at each other and that Flora was disrespecting him and called him a bitch.

James states that the argument then became physical and he was hitting Flora. James states that he began hitting Flora because she made him so angry that he went berserk. James states that while they were fighting, he pushed Flora into the window and the window broke. James states that he pushed Flora because he wanted to hurt her and he was angry. James states that [a]fter Flora went into the window the first time, he continued to fight with her. James states that he continued to hit Flora because of his anger. James states that he then pushed Flora back into the window a second time and she broke the center window which is the bigger one. James states that he pushed her the second time because he was still trying to hurt her. James states that Flora went into the window and the glass

4

broke. James states that he then saw Flora was cut and was bleeding. James states that Flora was bleeding a lot and holding her arms.

James states that he still continued to struggle with Flora and she got blood on his pajama bottoms. James states that Flora broke free from him and ran out of the apartment.

James states that he did not go out after Flora and closed the door of the apartment behind her. James states that he did this because he just didn't care about what happened to Flora.

James states that he then washed the blood off his hands and put on some pants over his bloody pajamas.

James states that he then heard people outside in the hallway saying that they were going to call the police and an ambulance. James states he then opened the door and saw Flora lying in the hallway bleeding. James states that he saw other people in the hallway but does not remember who was out there or how many. James states that he then said that Flora tried to jump out of the window herself but that was not the truth. James states that he said that because he knew what he did was wrong and he didn't want to get in any trouble.

People v. Collins, No. 01 CR 13513, at 8-9 (Ill. App. Ct. June 19, 2006) [hereinafter Collins].

2. *Expert Medical Opinions*

a. **State of Illinois' Forensic Clinical Services Evaluations**

Prior to trial, Collins filed a motion to suppress his statements to law enforcement personnel (the "Motion") and the circuit court subsequently ordered the State of Illinois' Forensic Clinical Services ("FCS") to evaluate Collins' ability to understand his rights under Miranda. On October 11, 2002, Dr. Susan Messina, Psy.D., a clinical psychologist for FCS, and Dr. Philip Pan, M.D., a staff psychiatrist for FCS, submitted reports to the court. Dr. Messina noted in her opinion that "the defendant evidenced confusion and an inability to grasp the significance of making a statement to authorities," and thus concluded that Collins' "intellectual limitations and childlike demeanor prevent him from understanding the circumstances of his arrest and the consequences of speaking to the

police. Therefore, as a result of intellectual deficiencies and evidence of brain damage, it is my opinion that this defendant WOULD NOT HAVE BEEN CAPABLE OF UNDERSTANDING HIS MIRANDA WARNINGS." Messina Report, Oct. 11, 2002.

Dr. Pan stated that he could offer no opinion as to defendant's mental capacity at the time of his interrogation because Collins' "documented cognitive deficiencies, the possible effects of drug intoxication or withdrawal with crack cocaine, and an overwhelmed and distraught emotional state leads to a murky reconstruction of the defendant's likely mental state at that time." Pan Report, Oct. 11, 2002. Dr. Pan did opine, however, that "defendant had an adequate understanding of Miranda at the time of [Pan's] examination" of Collins. Id.

### b. Expert Medical Testimony Offered at Hearings on Collins' Motion to Suppress

During the hearings on Collins' Motion, Collins presented the expert testimony of three witnesses and the State put forward one expert witness in opposition.

#### i. Dr. Linda Wetzel, Ph.D.

Dr. Linda Wetzel, Ph.D., a board-certified clinical neuropsychologist at the West Side Veterans' Administration Hospital, testified on behalf of Collins that, among other brain maladies, Collins had suffered a stroke in his left frontal lobe and a cerebral aneurysm in 1994. According to Dr. Wetzel, Collins' IQ was 63, his reading and arithmetic abilities were at a third grade level and his spelling was at a second grade level. Dr. Wetzel testified that the Miranda rights waiver form is written at a sixth or seventh grade reading level.

With respect to Collins' understanding of Miranda, Dr. Wetzel testified as follows:

[Collins] said that the sentence you have the right to remain silent means 'I don't even have to say hello to you.' For the second sentence he said the same thing. 'I don't even have to say hello to you.' His explanation for the third sentence was you have the right to talk to a lawyer and to have a lawyer present during questioning. Basically a repetition of the sentence itself. He said 'I'm from the old school, I have morals, they incriminated on me.' So he really didn't give an explanation of that sentence.

Hr'g Tr., June 11, 2003 at A-25.

Dr. Wetzel also noted that Collins is "intellectually limited and he likes to kind of compensate for that and to go along with whatever people say. He tends to indiscriminately agree with people. So that . . . his intellectual limitations are not tested by them." Id. at A-26-27.

Dr. Wetzel concluded that Collins "is unable to understand or waive his Miranda rights." Id. at A-26. Dr. Wetzel based her opinion on Collins' low IQ, the severity of his past brain impairment, his low reading and spelling scores and his inability "to resist other people's urgings and requests that he do things." Id.

### ii. Dr. Susan Messina, Psy.D.

Dr. Messina, who previously submitted a report to the trial court as part of the FCS evaluation of Collins, testified on behalf of Collins that he "would not have been capable of understanding or appreciating his Miranda rights." Hr'g Tr., June 25, 2003 at B-22-23.

Dr. Messina stated that Collins had a verbal IQ of 68, a performance IQ of 68, and a full scale IQ of 65, which placed Collins "in the mildly mentally-retarded range of intellectual functioning." Id. at B-15. Dr. Messina averred that Collins "most severe" deficiencies were in the areas of "attention, information processing, practical judgment, reality testing and the use of relative [] facts." Id. at B-17. She also noted that Collins'

"was very pleasant and cooperative, almost to a fault, kind of like in a childlike manner, wanting to please very much, wanting to do the right thing." Id. at B-21.

According to Dr. Messina, Collins did understand the meaning of the words contained in the Miranda warning. Dr. Messina testified that Collins interpreted the right to remain silent as follows: "It means something could be used against me. You don't say nothing until your attorney is present." Id. at B-61. With respect to the use of a person's statements in a court of law, Collins explanation was, "Whatever I said, it's best to be the right vocabulary coming out of the volume. Then in court they can say, 'You said this, that, woo, woo, woo.' It's always best to have your lawyer." Id. at B-62. As to a defendant's right to an attorney, even if he could not afford one, Collins responded, "They gonna give me one." Id.

Dr. Messina testified, however, that the "practice effect" – where a subject's testing ability improves as the result of practicing from previous tests – quite possibly allowed Collins to understand his Miranda rights better at the time of her examination than at the time of his waiver of those rights.

### iii. Dr. Linda Gruenberg, M.D.

Dr. Linda Gruenberg, M.D., a board-certified forensic psychiatrist, testified for the State that "at the time of [her] evaluation, Mr. Collins d[id] understand his Miranda rights and d[id] understand the consequences of the waiver of his Miranda rights." Hr'g Tr., July 16, 2003 at D-20.

In support of her opinion, Dr. Gruenberg testified that when she asked Collins what the Miranda rights are, he responded, "you have the right to right to remain silent, anything you say may be used against me." Id. at D-12. Collins also told Dr. Gruenberg

8

the right to remain silent meant, "zip it, shut up, don't talk, like a mannequin. Don't talk no matter how bad. Don't have to say." Id. at D-14. With respect to the use of a person's statement in a court of law, Collins stated, "even like I explained to you about everything that I say can be used against you, like you told me from the state when you first came here." Id. As to the right to have an attorney present, Collins told Gruenberg that "the consequences of that could be devastating, overwhelming, but that he did not need an attorney to answer the questions." Id. at D-15. Collins went on to say, "I didn't need an attorney because I didn't do anything that I needed an attorney to defend on." Id. Collins, asked to give an example of a "consequence," stated as follows: "don't do it, but if I do, will suffer the consequence and that is on the unfortunate part that this is happening and might regret it. And might not." Id. at D-16. When Gruenberg read Collins the section of Miranda concerning the provision of an attorney for those who cannot afford one, he said "it was clear." Id. at D-15. Asked to explain, Collins said, "you said it." Id.

Under cross-examination, Dr. Gruenberg opined that Collins' understanding of the Miranda rights would "not necessarily" have been better at the time of her examination due to the "practice effect" potentially created by Collins' prior examinations. Id. at D-29. Dr. Gruenberg also testified that, contrary to the testimony of doctors Wetzel and Messina, she did not find Collins was excessively compliant. Id. at D-18.

### iv. Dr. Daniel Hier, M.D.

Dr. Daniel Hier, chairman of the department of neurology at the University of Illinois-Chicago, also testified on behalf of Collins. Dr. Hier based his testimony

primarily on his review of Collins' medical records and the evaluative reports of Doctors Pan, Wetzel, Messina and Gruenberg. Dr. Hier found the mycotic brain aneurysm Collins suffered in 1994 particularly significant because the aneurysm caused a hemorrhage that was large enough to destroy brain tissue and leave a cavity in Collins' brain. Dr. Hier noted that "[b]oth Doctor Messina and Doctor Wetzel reported deficits in neuropsychological functioning in Mr. Collins which were compatible with a frontal lobe hemorrhage with bilateral frontal lobe damage." Hr'g Tr., August 25, 2003 at H-17. According to Dr. Hier, the frontal lobes are very important to a person's memory and language abilities.

With respect to Dr. Gruenberg's report, Dr. Hier found Collins' responses to Gruenberg's questions about <u>Miranda</u> "kind of vapid, empty, vacuous and not reflecting a lot of understanding as to what the <u>Miranda</u> rights really entailed." <u>Id.</u> at H-38. Dr. Hier went on to state, "[Collins] basically kind of repeated back to [Dr. Gruenberg] what she said in very simplified words. To me it didn't express an understanding of what the <u>Miranda</u> rights actually meant but again these are two different people interpreting the same information." <u>Id.</u>

### 3. Testimony of Mirandizing Law Enforcement Officials

At the hearings on Collins' motions to suppress, the State also presented the testimony of the three law enforcement officials who read Collins his <u>Miranda</u> rights. Detective O'Shea testified that he first read Collins his <u>Miranda</u> rights from a preprinted form contained in the Fraternal Order of Police book at approximately 10:30 a.m. on May 1, 2001, and that Collins affirmatively waived each one of those rights after O'Shea read it to him. O'Shea stated that he asked Collins whether he understood each of the rights as

they were read to him and Collins responded in the affirmative every time. According to O'Shea, Collins never demonstrated any confusion as to what his rights were and did not ask O'Shea any questions regarding his rights under Miranda. O'Shea further stated that Collins was "calm and cooperative" during the initial interview and "extremely talkative." Hr'g Tr., August 13, 2003 at 12-G. O'Shea testified that he read Collins his Miranda rights again just prior to midnight the same day in the same manner that he did previously in the day. O'Shea said that Collins again affirmatively waived all his rights and expressed no confusion as to what his rights were under Miranda.

Officer Bartik testified that he also read Collins his Miranda rights on the evening of May 1, 2001 in connection with the polygraph examination he administered Collins. The polygraph subject consent form Collins ultimately signed contained the Miranda rights and Bartik read Collins those rights "verbatim." Bartik stated that he asked Collins if he understood his Miranda rights and Collins said that he did. According to Bartik, Collins never asked any questions regarding his Miranda rights and did not appear to be confused at all regarding any of the information contained in the consent form.

Assistant State's Attorney Heil testified that he administered Collins his Miranda rights one more time at 6:00 a.m. on May 2, 2001. After Heil read Collins each specific right, Heil asked him if he understood the right and each time Collins responded affirmatively. Heil then asked Collins if he wished to answer questions and Collins said yes. According to Heil, Collins appeared to understand his rights and did not appear to be confused. Heil testified that after Collins agreed to give a statement and have Heil record it by hand, Heil had Collins read the Miranda rights that were written on the pre-printed statement form. Heil stated that Collins did not have any difficulty reading those

11

Miranda rights. When Heil asked Collins if he understood the Miranda rights Collins had just read, Collins said yes and Heil then "asked [Collins] to sign just below that [Miranda] paragraph attesting that he did understand what he just read to me, and he did sign it in his own signature." Hr'g Tr., August 4, 2003 at F-17. Heil acknowledged on cross-examination that Collins was "cooperative" and "talked a lot." Id. at F-32.

Finally, the State had Chicago police officer Garza ("Garza") testify that on February 3, 1998 at approximately 11:05 p.m. he placed Collins under arrest for possession of a controlled substance and disorderly conduct. Garza stated that when he placed Collins into custody he read Collins his Miranda rights from a Fraternal Order of Police book. According to Garza, Collins did not ask him any questions or show any confusion regarding his rights.

The parties agreed by stipulation that, if called to testify: (1) Officer Kotorac would testify that on August 22, 1997 at 3:10 p.m. he placed Collins in custody for criminal trespass to state supported land and advised Collins of his Miranda rights at that time; (2) Officer Baker would testify that on August 3, 1998 at 2:45 p.m. he placed Collins under arrest for possession of a controlled substance and advised Collins of his Miranda rights at that time; and (3) Officer Rosner would testify that on May 23, 1998 he placed Collins under arrest for possession of a controlled substance and advised Collins of his Miranda rights at that time.

### 4. Ruling of Cook County Circuit Court

On September 3, 2003, the circuit court issued a twelve page ruling denying Collins' motion to suppress his statements to law enforcement personnel. See generally People v. Collins, No. 01 CR 13513 (Cook County Cir. Ct. Sept. 3, 2003). The circuit

12

court relied on <u>Miranda</u> and <u>Moran v. Burbine</u>, 475 U.S. 412 (1986), as well as several Illinois Supreme Court and Illinois Appellate Court cases, to find that under the "totality of the circumstances" Collins "had the requisite capacity to both understand and knowingly and intelligently waive his <u>Miranda</u> rights." <u>Id.</u> at 11.

The circuit court first addressed the expert testimony of Doctors Wetzel and Messina, acknowledging that Collins "does indeed suffer intellectual deficits." <u>Id.</u> at 9. However, the trial court noted that Illinois courts had repeatedly held that defendants with low IQs were capable of voluntarily waiving their <u>Miranda</u> rights.

With respect to Collins, the circuit court found it significant that "Collins was given his <u>Miranda</u> warning at least five times and on each occasion affirmatively stated that he understood the rights," and that "[t]he answers [Collins] gave to questions put to him were responsive and no abnormalities were observed by the state's attorney or police officers who had contact with him." <u>Id.</u> at 10. In addition, the circuit court noted that Collins had been read his <u>Miranda</u> rights after prior arrests and "evinced no difficulty in understanding his rights or answering questions." <u>Id.</u> Finally, the circuit court considered it relevant that Collins initially refused to confess because "[Collins'] explicit refusal to do so belies his argument that he confessed later only because he did not understand those rights and because law enforcement officials took advantage of his limited mental abilities." <u>Id.</u> at 11.

### 5. *Illinois Appellate Court Order*

On June 19, 2006, the Illinois appellate court issued an unpublished order that, among other rulings, affirmed the circuit court's denial of Collins' motion to suppress. See generally <u>Collins</u>. The appellate court first stated that the question of "[w]hether a

13

defendant lacks capacity to understand and waive his <u>Miranda</u> rights due to mental deficiency or illiteracy is a question of fact to be determined by the trial court." <u>Id.</u> at 46 (quoting <u>Smith v. State</u>, 602 S.E.2d 921, 925 (Ga. App. Ct. 2004)). The court then held that the circuit court's decision could not be described as "unreasonable, arbitrary or not based on the evidence" because there was conflicting evidence in the record regarding Collins' ability to make a knowing and intelligent waiver of his rights. <u>Id.</u> at 47. Specifically, the court noted that Collins' answers to Doctors Wetzel, Messina and Gruenberg "were, at the very least, capable of being interpreted as reflecting the necessary understanding of his right to remain mute, the State's desire to use his statements, and to have a lawyer present." <u>Id.</u> at 49.

In addition, the court held that the circuit court properly considered the testimony of Dr. Gruenberg, even though she conceded "her opinions would only be valid if [Collins'] mental state at the time of her interviews was the same as at the time of his interrogation," because the court found "no evidence to suggest that there would have been any significant change in defendant's mental functioning between his interrogation and Dr. Gruenberg's interviews." <u>Id.</u> Explaining further, the court stated that the circuit court was not obligated to adopt the "practice effect" theory put forth by Dr. Messina, who suggested that Collins' understanding of his <u>Miranda</u> rights may have improved after repeatedly being questioned on the subject, where she only testified that it was "'quite possible' that defendant had benefitted from [the] effect." <u>Id.</u> at 48. The court also noted that Dr. Messina's "admission that frequent exposure to <u>Miranda</u> would aid his comprehension, when viewed in tandem with the state's introduction of the stipulations showing that defendant had been advised of his rights during numerous, previous arrests,

could also be taken to suggest that defendant had been getting significant practice before the police encounter in question." Id. Therefore, the court concluded that after reviewing all the expert testimony, as well as the testimony of assistant state's attorney Heil, Officer Bartik and Detective O'Shea, that the circuit court did not act "unreasonably, arbitrarily, or without evidentiary support." Id. at 50.

## B.    PROCEDURAL HISTORY

On December 17, 2003, Collins was convicted of first-degree murder after a bench trial in the Circuit Court of Cook County and sentenced to a twenty-five year term of imprisonment. Collins appealed his conviction, but on June 19, 2006 the Illinois Appellate Court issued an unpublished order affirming Collins' conviction, as well as the circuit court's denial of Collins' motion to suppress his statements to law enforcement personnel and motion to quash his arrest. On November 29, 2006, the Illinois Supreme Court denied Collins' petition for leave to appeal the appellate court's order. On May 10, 2007, the Circuit Court of Cook County denied Collins' post-conviction petition. Collins' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is now fully briefed and before the Court.

## II. DISCUSSION

### A. STANDARD OF DECISION

Collins' petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which sets a high hurdle for habeas relief. The statute states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's decision]." Owens v. Frank, 394 F.3d 490, 496 (7th Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court's decision is an unreasonable application of clearly established Supreme Court law if the state court "identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; see also Owens, 394 F.3d at 496. In order for a state court decision to be considered "unreasonable" under this standard it must be more than incorrect, it must lie "well outside the boundaries of permissible differences of opinion." Hardaway v. Young, 302 F.3d 757, 762 (7th Cir. 2002); see also Schultz v. Page, 313 F.3d 1010, 1015 (7th Cir. 2002) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case.") (quotations and citation omitted).

Unreasonableness "also serves as the touchstone against which state court decisions based upon determinations of fact in light of the evidence presented are evaluated." Ward v. Sternes, 334 F.3d 696, 703 (7th Cir. 2003). Section 2254(e)(1) states that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Accordingly, "a petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error. Instead, he must further establish that the state court committed unreasonable error." Ward, 334 F.3d at 703-04; see also Virsnieks v. Smith, 521 F.3d 707, 714 (7th Cir. 2008) ("In short, the state court decision must be both incorrect *and* unreasonable.") (citations and quotations omitted).

Under § 2254, a habeas petitioner must exhaust the remedies available in state court prior to pursuing federal habeas relief. See 28 U.S.C. § 2254(b)(1)(A). Any claim not presented to the state's highest court is deemed procedurally defaulted. See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (indicating that "a petition for discretionary review in Illinois' Supreme Court is a normal, simple, and established part of the State's appellate review process").

In addition to exhausting the remedies available in state court, a habeas petitioner is procedurally barred from raising claims in a federal habeas court that he did not raise in the state court proceedings. See O'Sullivan, 526 U.S. at 848 (holding that a petitioner's failure to present three claims to the Illinois Supreme Court for discretionary review

17

resulted in a procedural default of those claims). Fair presentment of a constitutional claim requires a habeas petitioner to present both the operative facts and the controlling legal principles to the state court before bringing the claims to a federal habeas court. Cf. Rodriguez v. Scillia, 193 F.3d 913, 916 (7th Cir. 1999) (discussing exhaustion of claim) (citing Picard v. Connor, 404 U.S. 270, 277 (1971)). Thus, a habeas petitioner procedurally defaults, or waives, any claim raised for the first time in federal court. With the above principles in mind, the Court examines Collins' Petition.

## B. COLLINS CLAIM FOR RELIEF UNDER 28 U.S.C. § 2254

### *1. Illinois Appellate Court's Findings of Law*

#### a. Standard of Review

Collins first asserts that the appellate court employed an improperly deferential standard of review when it held that a defendant's lack of capacity "to understand and waive his Miranda rights due to mental deficiency or illiteracy is a question of fact to be determined by the trial court." Collins, at 46 (citing Smith, 602 S.E.2d at 925). According to Collins, the "'ultimate question regarding the voluntariness of a Miranda waiver is entitled to de novo review.'" Collins Pet. at 28 (quoting Ward, 334 F.3d at 705 n.2. Importantly, however, Ward is not a United States Supreme Court decision and therefore cannot establish United States Supreme Court precedent. See Young v. Walls, 311 F.3d 846, 851 (7th Cir. 2002) ("[U]nder § 2254(d) only the decisions of the Supreme Court of the United States matter on collateral attack of a state court's judgment.").

Moreover, the general proposition of law Collins cites, although not incorrect, is not necessarily at odds with the state court's ruling. Collins ignores the fact that "[w]hen a Miranda waiver is challenged, two distinct questions are presented: whether the waiver

was voluntary, knowing, and intelligent as a matter of fact, and whether it was involuntary as a matter of law." Henderson v. DeTella, 97 F.3d 942, 946 (7th Cir. 1996) (citations omitted); see also id. ("Whether a petitioner actually waived his *Miranda* rights, and whether he did so freely, knowingly, and intelligently, are fact-dependent issues that the state courts are best situated to resolve.") (citations omitted); id. ("Whether a defendant made a voluntary, knowing and intelligent waiver of his Miranda rights is distinct from the issue of whether, under the totality of the circumstances, the challenged statement was involuntary.") (citation omitted). Although Henderson is no more able to establish United States Supreme Court precedent than Ward, Collins fails to identify any United States Supreme Court cases – and there do not appear to be any - that state that a defendant's capacity to waive his Miranda rights is a question of law as opposed to a question of fact. Without such a holding from the United States Supreme Court, the Illinois appellate court's finding that Collins' capacity to waive his Miranda rights is a question of fact cannot be considered an unreasonable application of clearly established Supreme Court precedent and therefore does not constitute grounds for granting Collins' Petition.

### b. The Special Care Requirement

Collins also claims that the Illinois appellate court ignored the "special care" requirement that allegedly obligates police officers to take extra care with juveniles and mentally disabled adults when obtaining a waiver of Miranda rights. As respondent correctly points out, the Supreme Court cases cited by Collins do not create any obligations for police officers, but rather direct reviewing courts to use "special care" in reviewing the record to determine whether a confession was voluntary. More

significantly, the relevant Supreme Court cases Collins cites as evidence of the special care requirement involve juveniles and not mentally disabled adults. See generally Fare v. Michael C., 442 U.S. 707 (1979); In re Gault, 387 U.S. 1 (1967); Gallegos v. Colo., 370 U.S. 49 (1962). Thus, even assuming the Illinois appellate court did fail to employ "special care" when reviewing the record as to interactions between law enforcement personnel and Collins, such a failure would not be contrary to federal law because Collins was an adult.

### c. Interpretation of **Miranda** and its Progeny

According to Collins, the appellate court's ruling is contrary to federal law because it ignored substantive aspects of Miranda and its progeny. In particular, Collins states that the appellate court (1) failed to recognize that the State "bears the 'heavy burden' of demonstrating that an accused knowingly and intelligently waived his Fifth Amendment privilege," Collins Pet. at 24 (quoting Miranda, 384 U.S. at 475); and (2) ignored the "consequences" part of the "knowing and intelligent" waiver standard set forth in Moran. In Early v. Packer, however, the Supreme Court explicitly stated that a state court ruling is not contrary to Supreme Court precedent simply because it fails to cite to relevant Supreme Court opinions. 537 U.S. 1, 8 (2003) (holding with respect to § 2254(d) that a state court need not even be aware of relevant United States Supreme Court cases as long as its holding does not contradict Supreme Court precedent).

In the present case, although the appellate court's opinion does not use the phrase "heavy burden," the opinion does correctly recite the rules of waiver as established by Moran. See Collins at 45-46. In fact, contrary to Collins' assertion, the opinion explicitly acknowledges that waivers "must be knowing and intelligent acts in the sense

that they are done with sufficient awareness of the relevant circumstances and likely consequences." Id. at 45-46 (quoting People v. Braggs, 810 N.E. 2d 472, 486 (Ill. 2003)). Moreover, as Early makes clear, even if the appellate court opinion failed to cite any Supreme Court opinions and evinced no knowledge of relevant Supreme Court precedent, the opinion would still not necessarily be contrary to federal law.

Here, Collins does not direct the Court to any "materially indistinguishable" Supreme Court precedents that reached a different result than the Illinois Appellate Court. See Owens, 394 F.3d at 496. Rather, with respect to Miranda waiver standards, Collins only cites to Supreme Court cases for general, uncontroverted propositions of waiver law, see, e.g., Collins Pet. at 33 (citing Miranda for the proposition that "the State bears a 'heavy burden' to demonstrate a knowing and intelligent waiver"), and does not identify any Supreme Court case where, for example, an adult, as opposed to a juvenile, was held not to have the capacity to waive his Miranda rights because of a mental disability. That failure is certainly understandable given the current state of the law. As the Seventh Circuit stated:

> Perhaps the legal system should adopt additional rules to deal with suspects of limited intellectual abilities. But they are not now in place, nor has the Supreme Court concluded that rules of this kind are to be found in the Constitution. We have held that even teenagers can confess, and without the supervision or assistance of a supportive adult such as a parent. No decision holds that retarded suspects are unable to confess because they can't comprehend *Miranda* warnings . . . .

Young, 311 F.3d at 850-51 (internal citations omitted).

The Court has not been able to locate any Supreme Court cases that would call the Seventh Circuit's statement in Young into question, nor has Collins identified any such

cases. Thus, the Court concludes that the appellate court's opinion was not contrary to clearly established Miranda waiver law.

## 2. *Illinois Appellate Court's Findings of Fact*

Collins last contention is that the appellate court's opinion was based on the unreasonable factual determinations that (1) Collins' "mental state at the time of the custodial interrogation would have been the same as during his evaluation with Dr. Gruenberg nearly 20 months later," Collins Pet. at 41-42; and (2) Collins' "waiver was knowing and intelligent because he could repeat certain parts of the Miranda warnings and even explain some of the phrases." Id. at 42. The Court finds that neither of these factual findings were "'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable." Ward, 334 F.3d at 704 (quoting Hall v. Washington, 106 F.3d 742, 749 (7th Cir. 1997)).

The appellate court concluded that Dr. Messina's testimony regarding the practice effect did not obligate the circuit court "to assume that defendant's understanding of Miranda had drastically improved from the time of the police's admonitions to Dr. Messina's interview." Collins at 48. The appellate court based this decision on the fact that Dr. Messina only testified that "it was 'quite possible'" that Collins benefitted from a practice effect. Id.; see also Hr'g Tr., July 16, 2003 at D-29 (Dr. Gruenberg testifying that Collins' understanding of his Miranda rights would "not necessarily" have been better at the time of her examination as a result of the practice effect). In addition, the appellate court noted that to the extent the practice effect theory has validity, Collins' previous arrests, where he was advised of his Miranda rights on multiple occasions, "suggest that [Collins] had been getting significant practice before the police encounter in

question." Collins at 48. Indeed, as the appellate court stated, even "Dr. Messina admitted that [Collins] understood the words of the Miranda admonishments." Id.; see also Hr'g Tr., June 25, 2003 at B-55 (Dr. Messina testifying that Collins understood the meaning of the words contained in Miranda). Thus, placed in this context, the appellate court's decision not to accept what Collins' own expert conceded was a speculative theory regarding Collins' comprehension of Miranda cannot be considered objectively unreasonable, especially where that same expert admitted that Collins did understand the words of Miranda.

The appellate court's determination that Collins' answers to the expert witnesses' questions demonstrated he was capable of knowingly waiving his Miranda rights was also supported by the record. Collins' repeatedly indicated that he was aware what the right to remain silent meant. See Hr'g Tr., June 11, 2003 at A-25 (Collins explaining to Dr. Wetzel "the sentence you have the right to remain silent means I don't even have to say hello to you"); see also Hr'g Tr., June 25, 2003 at B-61 (explaining to Dr. Messina that the right to remain silent "means something could be used against me. You don't say nothing until your attorney is present."). Collins also provided arguably responsive answers when questioned regarding the meanings of the other Miranda rights. See Hr'g Tr., June 11, 2003 at A-25 (explaining to Dr. Wetzel that the right to an attorney meant "you have the right to talk to a lawyer and to have a lawyer present during questioning"); see also Hr'g Tr., July 16, 2003 at D-14 (explaining to Dr. Gruenberg with respect to the use of a person's statement in a court of law that "everything that I say can be used against you, like you told me from the state when you first came here").

Certainly one plausible interpretation of Collins' responses is that he understood his <u>Miranda</u> rights and was therefore capable of knowingly and intelligently waiving those rights. <u>See</u> <u>Young</u>, 311 F.3d at 850 (holding that a habeas petitioner with an IQ of 56 was capable of understanding the <u>Miranda</u> warnings because he "had enough awareness (the state court found) to understand what a lawyer is and his entitlement to direct the police to stop asking questions. This is all the fifth amendment demands."). The appellate court, not unreasonably, reached this same conclusion, choosing to credit the testimony of Dr. Gruenberg – and the responses Collins provided to all three experts – over the conclusions of Doctors Wetzel and Messina. Although a different court could possibly have reached a different conclusion based on a review of the same responses, that is not a sufficient reason to grant a writ of habeas corpus under § 2254. <u>See</u> <u>Virsnieks</u>, 521 F.3d at 714; <u>see also</u> <u>Ruvalcaba v. Chandler</u>, 416 F.3d 555, 560 (7th Cir. 2005) (holding that federal courts do not reevaluate the credibility of witnesses when conducting habeas review of state court proceedings). Thus, Collins has not established by clear and convincing evidence that the appellate court's finding that Collins was capable of knowingly waiving his <u>Miranda</u> rights was an objectively unreasonable interpretation of the expert medical testimony and his final argument therefore fails.

## III. CONCLUSION

For the foregoing reasons, Collins' Petition under 28 U.S.C. § 2254 for Writ of

Habeas Corpus by a Person in State Custody is denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: March 26, 2009